Kavanagh, J.
Appeal from an order of the Supreme Court (Giardino, J.), entered June 27, 2011 in Schenectady County, which, among other things, partially denied plaintiffs motion for partial summary judgment.
In December 1993, plaintiff’s mother, while pregnant with him, moved into an apartment owned and managed by defendants in the City of Schenectady, Schenectady County. Some months after plaintiff was born and while living with his mother *1532 in this apartment, tests were performed that indicated that he had elevated levels of lead in his blood.[1] As a result of these findings, the Schenectady County Public Health Services Environmental Health Unit inspected the apartment and found the presence of lead-based paint in the bedroom and the living room and, by letter dated April 10, 1996, directed defendants to immediately commence abatement proceedings to remove it from the premises. Thereafter, plaintiff and his family moved from the apartment.
In April 2009, when plaintiff was 15 years old, he commenced this action seeking damages for neurological and neurobehavioral injuries he claims to have sustained as a result of being exposed to lead-based paint while he lived in the apartment. After discovery was complete and a note of issue was filed, plaintiff moved for summary judgment on the issue of defendants’ legal responsibility for these injuries and for the dismissal of four affirmative defenses raised in response to the allegations set forth in the complaint. Plaintiff also requested that Supreme Court take judicial notice of certain legislative findings, statutes and regulations, as well as the Federal Lead-Based Paint Enforcement Bench Book and reports regarding lead paint exposure issued by the New York State Department of Health (hereinafter DOH) and the Centers for Disease Control (hereinafter CDC). In addition, plaintiff sought to preclude defendants’ experts from testifying regarding their contention that socioeconomic factors — and not exposure to lead-based paint — caused plaintiffs developmental and behavioral deficiencies or, in the alternative, that a Frye hearing be held to determine whether the testimony of these experts was admissible. Although Supreme Court found that defendants were on notice that a lead-based paint was present in the apartment while plaintiff lived there, it denied that part of plaintiffs motion seeking summary judgment on the issue of whether defendants were liable for the damages he allegedly sustained while living in the apartment, finding that factual issues existed as to whether plaintiffs exposure to lead-based paint caused his injuries. The court also found that a question of fact existed as to whether plaintiff had “engaged in behaviors that thwarted mitigation of his damages,” and denied his motion for summary judgment dismissing that affirmative defense. Finally, the court refused to take judicial notice of materials *1533 submitted by plaintiff from the DOH and CDC, and denied his motion to preclude defendants’ experts from testifying, as well as his request for a Frye hearing. Plaintiff now appeals.
Initially, defendants argue in their submissions to this Court that Supreme Court’s decision to grant plaintiff summary judgment on the issue of notice is not supported by the credible evidence in the record. In that regard, it “is well settled that in order for a landlord to be held liable for injuries resulting from a defective condition upon the premises, the plaintiff must establish that the landlord had actual or constructive notice of the condition for such a period of time that, in the exercise of reasonable care, it should have been corrected” (Juarez v Wavecrest Mgt. Team, 88 NY2d 628, 646 [1996]). Constructive notice of a hazardous, lead-based paint condition may be established by proof “that the landlord (1) retained a right of entry to the premises and assumed a duty to make repairs, (2) knew that the apartment was constructed at a time before lead-based interior paint was banned, (3) was aware that paint was peeling on the premises, (4) knew of the hazards of lead-based paint to young children and (5) knew that a young child lived in the apartment” (Chapman v Silber, 97 NY2d 9, 15 [2001]; see Williamson v Ringuett, 85 AD3d 1427, 1428 [2011]; Charette v Santspree, 68 AD3d 1583, 1584 [2009]; Wynn v T.R.I.P Redevelopment Assoc., 296 AD2d 176, 180 [2002]). Here, Supreme Court found, based on evidence that plaintiff presented, that defendants knew of the dangers that lead-based paint posed to young children, that the building was constructed prior to 1978 and that defendants retained the right during the relevant time period to enter the premises to perform necessary repairs. In addition, plaintiffs mother testified that defendants knew she was pregnant when she moved into the apartment and ignored her complaints about paint dust and chips on the windows and floors in the apartment.
Defendants do not admit, but do not deny, that plaintiff’s mother complained to them about the condition of the apartment and acknowledged that they were aware of the hazards that lead-based paint posed for a young child. They admit that they may have known that plaintiffs mother was pregnant when she moved into the apartment, but do not recall performing any repairs or renovations on the apartment while she resided there. Finally, defendants do not recall, but again do not deny, receiving a letter from the Schenectady County Public Health Services indicating that lead-based paint had been used in the apartment and directing them to remove it. While defendants claim that plaintiffs testimony is not credible, they *1534 have failed to submit any competent evidence that contradicts her essential contentions on this issue. More importantly, the notification from the Schenectady County Public Health Services, which they do not deny receiving, clearly put them on notice of this condition and did so at a time when plaintiff still resided on the premises. As such, Supreme Court properly found that defendants had notice that lead-based paint was on the walls and windows of plaintiffs apartment and of the danger it posed to plaintiff while he lived there.
On the issue of liability, we agree with Supreme Court that a question of fact exists as to whether plaintiffs exposure to lead-based paint while he lived in the apartment caused his injuries. In that regard, plaintiff submitted an affidavit from a licensed clinical psychologist who examined him and administered a number of tests. This expert diagnosed plaintiff with a malady of cognitive and developmental disorders, including attention deficit hyperactivity disorder (hereinafter ADHD), and concluded that he had a “poor prognosis of remediation of his cognitive deficits.” The expert concluded that “[o]f all known and relevant factors, [plaintiffs] chronically and significantly elevated blood lead levels are the most likely” cause of these disorders, and he claimed that elevated blood levels during childhood “have been well-documented as a significant causal factor in the development of serious and chronic developmental and cognitive impairments.” In support of this conclusion, plaintiffs expert relied on “government endorsed scientific literature, including . . . the 2005 CDC statement relating to effects of lead poisoning; and . . . the 2007 [profile of the Agency for Toxic Substance and Disease Registry] relating to the toxicology of lead.”
Plaintiff also submitted an affidavit from a board-certified pediatrician, who reviewed relevant medical records and reports and concluded that “lead poisoning causes neuropathy and damage to the brain” and noted the lack of any established link of socioeconomic and genetic factors as causing the neurological affects that can be caused by exposure to lead paint. These opinions provided a scientific as well as a medical basis for the conclusion that plaintiffs exposure to lead paint while he lived in defendants’ apartment caused his injuries (see Juarez v Wavecrest Mgt. Team, 88 NY2d at 648; Wynn v T.R.I.P. Redevelopment Assoc., 296 AD2d at 184-185).
Defendants do not contend that plaintiff does not suffer from these cognitive deficits and developmental disabilities, but argue that they were caused not by lead paint, but by socioeconomic factors attendant to his family life. In that regard, they submit *1535 ted affidavits from two neuropsychologists — one who specialized in pediatric neurology — who examined plaintiff and reviewed relevant medical records. One expert found that plaintiff demonstrated “average intellectual and cognitive capability, in the context of a language-based learning disorder.” He pointed to familial, hereditary or idiopathic causes of such learning disorders that he argues were “unrelated to his history of mildly elevated lead levels,” and claims that plaintiffs behavioral difficulties were caused by his exposure to “chronic environmental stress” and were the end product of “a long history of marked family turmoil.” Defendants’ other neuropsychologist found that plaintiff “had very modest lead exposure which would not be expected to have any clinical [detrimental] affect on his behavior, cognitive or academic abilities,” and noted the CDC’s claim that “efforts to identify a ‘neurobehavioral signature’ of children with [elevated blood lead levels] have generally been unsuccessful.” These opinions are not, as plaintiff claims, based entirely on speculation or conjecture, but in part, are supported by relevant scientific literature, some of which was relied upon by plaintiffs own experts in the formulation of their opinions regarding the cause of his injuries (see generally Cunningham v Anderson, 85 AD3d 1370, 1371 [2011], lv dismissed and denied 17 NY3d 948 [2011]; Bygrave v New York City Hous. Auth., 65 AD3d 842, 844-845 [2009]). As a result, this evidence served to create an issue of fact as to whether plaintiffs cognitive and behavioral difficulties were caused by his exposure to lead-based paint while he lived in this apartment, and plaintiffs motion for partial summary judgment finding defendants liable for his injuries was therefore properly denied (see Walton v Albany Community Dev. Agency, 279 AD2d 93, 95-96 [2001]).
As for that part of plaintiffs motion seeking dismissal of defendants’ affirmative defense regarding mitigation of damages, defendants allege that plaintiff, while a teenager, “at a time when [he] could be held legally responsible for his actions” (Cunningham v Anderson, 85 AD3d at 1372; see Dutcher v Vandeloo, 34 Misc 3d 1223[A], 2012 NY Slip Op 50210[U], *6 [2012]), failed to “follow up with recommended medical treatment” and “avail himself of all methods of treatment, counseling, intervention and other educational based services and generally accepted methods of treat[ment].” In that regard, plaintiff admits using marihuana since he was in seventh grade and acknowledges not complying with all of his treatment regimens or taking his medication as prescribed. Such evidence does provide a factual basis for defendants’ claim that plaintiff has not made a reasonable effort to mitigate the damages he may have sustained as a result of his exposure to lead paint, and *1536 plaintiffs motion seeking dismissal of this affirmative defense was appropriately denied.
Plaintiff also moved to preclude defendants’ experts from testifying or, in the alternative, for a Frye hearing to determine the admissibility of their testimony.[2] In that regard, we note that “[t]he admissibility and scope of [expert] testimony is addressed to the trial court’s sound discretion and will not be disturbed on appeal absent an abuse of that discretion or an error of law” (Jackson v Nutmeg Tech., Inc., 43 AD3d 599, 600-601 [2007]). Here, Supreme Court found, as previously noted, that defendants’ experts relied in part on the same scientific literature employed by plaintiffs experts in formulating their final opinion regarding the impact that exposure to lead paint had on plaintiff. Also, in denying plaintiffs request for a Frye hearing, the court specifically stated that defendants’ experts would only be allowed to testify if a proper foundation were established for the admission of their testimony at trial (see Jackson v Nutmeg Tech., Inc., 43 AD3d at 600-601).
Finally, plaintiff challenges Supreme Court’s refusal to take judicial notice of certain governmental materials that focused on lead paint — and its effects on individuals exposed to it. Supreme Court found that these materials were not “legally or scientifically current,” and its determination that they were not entitled to conclusive effect did not constitute an abuse of discretion (see Sleasman v Sherwood, 212 AD2d 868, 870 [1995]).
Peters, EJ., Rose, Lahtinen and Malone Jr., JJ., concur. Ordered that the order is affirmed, with costs.

. An elevated lead level is “a blood lead level greater than or equal to [10] micrograms . . . per deciliter [mcg/dcl] of whole blood” (Public Health Law § 1370 [6]; see 10 NYCRR 67-1.1 [e]). In October and November 1995, plaintiffs blood lead level measured 11 mcg/dcl. By March 1996, plaintiffs blood lead level had spiked to 16 mcg/dcl but, thereafter, decreased to nine mcg/dcl, then to six mcg/dcl and ultimately to three mcg/dcl.

. Although an order determining the admissibility of evidence is generally not appealable, Supreme Court concluded that this expert testimony served to create an issue of fact as to what caused plaintiffs injuries and relied upon its admissibility to deny plaintiffs motion for partial summary judgment. Given the crucial role this testimony played in that determination, plaintiff can, at this juncture, argue on appeal that the court erred in finding that it was admissible (see CPLR 5701; Jackson v Nutmeg Tech., Inc., 43 AD3d 599, 600 n [2007]).